IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

LISA ROACH,

                Plaintiff,              Case No. 3:19-cv-00698

v.                                Judge Trauger
                                    JURY DEMAND

MONTGOMERY COUNTY
GOVERNMENT,

                Defendant.
_____/

## PLAINTIFF'S OPPOSITION OF DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

Lisa Roach, an African American female, worked for the Montgomery County Sheriff's Office ("MCSO") for over 19 years when she was discriminatorily passed over for promotion based on her race and sex. MCSO has very little racial diversity in rank of Sergeant and no racial or gender diversity in higher ranks like Lieutenant or Captain. MCSO has a relatively objective policy and procedure which outlines a multi-part method for determining the qualified candidates for promotion. However, the final decision for promotion is entirely subjective based on the sole decision of the Sheriff. When Ms. Roach, sought promotion to Sergeant, a job she had been performing during the acting Sergeant's absence, and scored the highest overall on the objective testing, MSCO instead promoted a white male. The only criteria the MCSO relied on was the subjective judgement of the Sheriff, a white male, who had a history of promoting white males over minorities. In making this decision, the Sheriff based his decision on his interview of a white male, who he related more to, rather than Corporal Roach. A reasonable jury could conclude this subjective decision and MCSO's promotion practices are discriminatory when looking at objective

qualifications. For the reasons set forth herein, Defendant's Motion for Summary Judgment should be denied. (ECF 16, MSJ, ECF 17 MSJ Memo).

## I.  FACTUAL BACKGROUND

**MCSO Receives Federal Funding and Provides Training to its Officers and the Public**

MCSO receives federal funding through grants, performs "Title 7" training throughout the county, and education and training to its officers and the public, on occasion it sends officers to federal agency training academies, and it has federal contracts. (Fuson Dep. 142- 143). MCSO has not performed a diversity study during Sheriff Fuson's tenure. (Fuson Dep. 144). Sheriff Fuson has been the MCSO's Sheriff since 2012. (Fuson Dep. 8).

**MCSO Lacks Racial and Gender Diversity in its Upper Ranks**

MCSO employed 363 individuals as of August 17, 2018, although in 2020, Sheriff Fuson stated there were 408 employees, 21 at the courthouse. (MSJ Ex. 1, Resp. to EEOC, Roach 10-14; Fuson Dep. 27). There is no diversity (0%) in leadership at MCSO at the rank of Lieutenant and higher, they are all white males; and when Roach filed her EEOC charge (11/9/18), there were no black, female Sergeants or higher.[1] (Fuson Dep. 46, 128, 139-140,155-157, Ex. 15, 18, 20, 21 p. 000114-116; Roach Dep.192, 319; Stone Dep. 23; MSJ Ex. 2 D. Resp. to 2d Set of Interrogatories and RFP, Ex. 1; MSJ Ex.3, D. Resp. to 3d Set of Interrogatories and RFP, MCSO 0001211-1238). During Sheriff Fuson's 8-year tenure as Sheriff to the end of 2018, only one (1) woman (race-White) was promoted to Sergeant and she was assigned the jail division.[2] (Fuson Dep. 128, 129-131, Ex. 15 p. 54, Ex.16 p. 910, Ex. 18 p. 552; Snider Dep. 29; Roach Dep. 53, 193, 246, 259,

---

[1] Chain of Command is 1) Sheriff, 2) Chief Deputy, 3) Asst. Chief Deputy, 4) Captain, 5) Lieutenant, 6) Sergeant, 7) Corporal, 8) Investigator/SRO, 9) FTO, 10) Deputy. (Fuson Dep. Ex. 1 p. 710).
[2] Another female of color (Novelle Flippen) was promoted *after* Roach filed her EEOC charge; however, it is disputed whether Sgt. Flippen is "B" [Black] because there is testimony that she is actually Hispanic. Fuson Dep. Ex. 15; Snider Dep. 29.

318). From February 12, 2005 to November 9, 2018, 80 officers were promoted at the MCSO, of which 19 (23.75%) were female, and only 3 were female people of color (3.75%).[3] (MSJ Ex. 3, Promotions List, 1211-1215). Of the 19 females, 3 were promoted twice. (Id.). MCSO's last EEOC report from 2017, stated that it employed 209 employees in "Police Protection" of which 60 were female (28.70%) and 149 were male (71.29%); including 5 Black females (2.39%), 11 Black males (5.26%); a total of 16 (male and female) were Black (7.655%); 124 were White males (59.33%); and 53 were White females (25.35%). (MSJ Ex. 4 MCSO 2017 EEO-4 Reports pp. 51-53, 63-66). In contrast, the latest U.S. Census data for Montgomery County demonstrates that 57.4% of the labor force in Montgomery County is female (almost double that employed by MCSO), and that 21.3% of the population is Black (more than double that employed by MCSO). (MSJ Ex. 5 U.S. Census data 7/1/19).

**Cpl. Roach's Employment History with Montgomery County Sheriff's Office and Job Duties**

Cpl. Roach has been an MSCO employee for almost 22 years. (Roach Dep. 10, 14, Ex. 17[4]; Fuson Dep. Ex. 17 p. 000261). Roach was assigned to Court Security from 2002-2004. (Roach Dep. 10, 18). From 2004-2015, she worked as a Bailiff until she was promoted to corporal in 2015. (Roach Dep. 10). As a deputy, Roach trained all the new deputies in general sessions, which could take up to six months. (Roach Dep. 39, 42-46, Ex. 21 p. 000047). She requested Field Training Officer pay but never received any additional compensation for this additional work. (Roach Dep. 48-49, 232).

Cpl. Roach applied for the corporal position twice. (Roach Dep. 31-32). Sheriff Fuson was sheriff for both of Roach's corporal promotion attempts, and the MCSO promotional policy

---

[3] This is the time period before Plaintiff filed her EEOC charge on November 9, 2018.
[4] Plaintiff's maintained sequential exhibits throughout all of her depositions labeled corresponding to the deposition taken; Defendant also maintained a sequential set for Roach's deposition.

included the same components as the sergeant's promotional process in 2018. (Roach Dep. 32). A white female and white male were selected as corporal over Roach during this first corporal promotional process. (Roach Dep. 33, 58, 59). During Roach's second corporal promotion attempt in 2015, she was not Sheriff Fuson's first choice; instead, he preferred to promote a white male whom Roach had trained. (Roach Dep. 54). However, Chief Smith was present during her executive interview and told Sheriff Fuson he needed to promote her. (Roach Dep. 54). Lt. McManama told Sgt. Snider had Chief Smith not been in the room during her interview, Roach would not have received the promotion. (Roach Dep. 56).

Cpl. Roach's corporal duties included overseeing seven deputies, scheduling deputies, their training, administering first aid and receiving civil process. (Roach Dep. 67-68; Fuson Dep. Ex. 4). Cpl. Roach is a good worker with a good reputation, a high paced worker, and always moving. (Fuson Dep. 31, 55, 74, 76; Snider Dep. 11). Sgt. Snider considers Roach to be the most honest and trustworthy and reliable person he has ever met. (Snider Dep. 10-11, 13). Cpl. Roach trained approximately 20 deputies at the discretion of Lt. McManama, including Sgt. Welsh. (Snider Dep. 27; Roach Dep. 37, 219, 313, Ex. 22). Cpl. Roach was the only corporal assigned to work a specific courtroom and still perform deputy duties in addition to her corporal duties, while also still training all new general sessions deputies. (Fuson Dep. 74; Roach Dep. 68, 315).

After Sgt. Snider was promoted, Cpl. Roach asked to learn everything he did as a sergeant. (Snider Dep. 11; Roach Dep. 94). Sgt. Snider trained her on all his duties as a sergeant. (Snider Dep. 12, Roach Dep. 94). When Sgt. Snider was out, Cpl. Roach would perform all of his sergeant duties, her corporal duties, and her deputy duties. (Snider Dep. 12; Roach Dep. 92, 316; Fuson Dep. 72). Lt. McManama was aware Roach would cover Sgt. Snider's duties. (Roach Dep. 118). Sgt. Snider did not assign his job duties to anyone else; he did not trust anyone else, and Cpl.

Roach was the only one who expressed interest. (Snider Dep. 13). Roach did not receive any extra pay for taking on Sgt. Snider's duties. (Snider Dep. 30). Cpl. Roach covered the sergeant duties for a total of 100 days from 2015 to 2018. (Roach Dep. Ex. 1 pp. 000217-218).

**Montgomery County Sheriff's Office 2018 Promotional Policy**

MCSO has a written policy to ensure employees know the promotion process; therefore, when MCSO intends to deviate from it, MCSO issues a memo, initials it, notifies employees via email, and places it in the promotional packet. (Fuson Dep. 12-13). When there is a promotional opportunity, MCSO notifies employees that a sign-up sheet list has been posted. (Fuson Dep. 15). The promotional process includes a written test, oral board, a file review, a supervisor evaluation, points for longevity, and an executive interview. (Fuson Dep. 15, Ex. 1 p. 000701-702). Capt. John Stone, a white male, supervised the personnel department and was assigned to the management of professional standards bureau and responsible for personnel and training from 2017 to present. (Fuson Dep. 16; Stone Dep. 7-8, 10).

Capt. Stone and his department, in 2018, compiled the longevity scores, performed the file review for disciplinary actions in the last eighteen months, organized and prepared the questions for the written test and oral board, and sent off requests for the supervisor's review. (Fuson Dep. 17-19; Stone Dep. 12, 28-29, 31; Roach Dep. Ex. 5). This test is an objective testing tool. (Fuson Dep. 18). Capt. Stone's lieutenant, Mark Stone, a white male, calculated all promotional scores. (Stone Dep. 32-33, Ex. 5).

The personnel office chose the five to six lieutenants who participated on the oral board; this number is not required by policy. (Fuson Dep. 16-17). Despite the importance of having diversity in an interview panel, the panel was comprised exclusively white males, including the moderator, Lt. Stone. (Fuson Dep. 45-46, 127; Stone Dep. 22, 35; Roach Dep. 164, Ex. 7 p.

000031-35, Ex. 14). Not all lieutenants received training in unconscious bias. (Stone Dep. 24). In 2018, and presently, all executive staff members, rank lieutenant and above, were and are white males. (Fuson Dep. 46, 127, Ex. 21 p. 000114-116; Snider Dep. 17). At the beginning of the oral board, Lt. Stone introduced all persons and set the ground rules for answering the questions: he would ask the questions, and the lieutenants would score the individual. (Stone Dep. 36, Roach Dep. 165-166; Fuson Dep. 17, Ex. 7 p. 0031-35). Though designed to be objective, this scoring could be subjective as the scores ranged depending on the evaluator. (Fuson Dep. 18, Ex. 7 p. 000031-35; Stone Dep. 39). The process relies on the moderator to ensure objectivity. (Fuson Dep. 42).

**Sheriff's Interview is Entirely Subjective**

Personnel does not make any recommendations regarding the selection of the candidate for promotion, it simply sets up the interviews. (Fuson Dep. 36-37, 113). The Sheriff interviews three people per vacancy. (Fuson Dep. 20,109; Stone Dep. 16, 17). Sheriff Fuson used to always receive the entire promotional packet of each candidate, but he stated he does not want to see the scores because he thinks [the objective scoring process] will bias his decision. (Fuson Dep. 23). These interviews range from thirty minutes to an hour and a half. (Fuson Dep. 63-64, 114). This interview is entirely subjective because it is based solely on Sheriff Fuson's opinion. (Fuson Dep. 21, 125). Once the promotion is made, the Sheriff sends out a memo to inform staff who he promoted; there is no appeal process. (Fuson Dep. 118, 160).

Sheriff Fuson used to make decisions based on the more objective, scored point system rather than just his interview. (Snider Dep. 8). For example, during Sgt. Snider's promotional process from corporal to sergeant, Sheriff Fuson told him, "you don't even need my interview because you already have it on points." (Snider Dep. 8; Roach Dep. 190). Sheriff Fuson "most

definitely" was provided the scores, and Sgt. Snider, the highest scoring candidate, was promoted to sergeant. (Snider Dep. 8). However, Sheriff Fuson determined, "[t]he scoring system does not matter. That's just for purposes of getting an executive interview [with him]." (Fuson Dep. 20, 109). Sheriff Fuson had to be the "fair one," despite his acknowledgment the process needed subjective and objective components to eliminate bias in the decision-making process." (Fuson Dep. 25). He reasoned: "I've always felt that you can't pick your leaders on just a point system. There's a lot of things you cannot test for." (Fuson Dep. 109).

**The 2018 Sergeant Promotional Process**

On July 9, 2018, Lt. Stone issued the memo announcing the open sergeant's position. (Stone Dep. 26, Ex. 6). Cpl. Christopher Lyons, Cpl. Terrance Welsh, and Cpl. Roach signed up for the sergeant's promotion, which included a pay increase. (Fuson Dep. 26; Roach Dep. 152, Ex. 4). All candidates received a 10/10 on their file review, and Cpl. Lyons ten points for longevity, Roach a nine and a half points, and Welsh seven. (Fuson Dep. Ex. 5, 11).

Prior to the interviews, Sgt. Snider expressed his support of Cpl. Roach to Sheriff Fuson, as he had the years previously. (Fuson Dep. 53-54). He wanted to leave the department in a better place than he found it, and as the sergeant over all the candidates, he had a better feel for who would be better as a sergeant than Sheriff Fuson. (Fuson Dep. 55; Snider Dep. 17, Ex. 8 p.0021-26). Despite this, Sheriff Fuson never reviewed Sgt. Snider's evaluations before the executive interviews. (Fuson Dep. 56). Sgt. Snider scored Cpl. Lyons 16/20, Sgt. Welsh 17/20, and Roach 19/20. (Fuson Dep. 56, Ex. 8 p.000021-26; Roach Dep. 175). When he turned in his evaluations, Lt. McManama told him he would have to "back up the score." (Snider Dep. 15). Lt. McManama took him to Capt. Reynolds, a white male, to explain why he graded Roach higher than the other

two candidates. (Snider Dep. 16-17). This was unusual, but he explained Cpl. Roach worked harder, was more reliable, did what she was asked, and never complained. (Snider Dep. 16).

On July 16, 2018, while Cpl. Roach was still in the room receiving her written test score, Sheriff Fuson entered the room and asked her, exclusively, her score on the test. (Roach Dep. 52,158, 159, 219). Lt. Stone calculated the written scores, and Sgt. Welsh ultimately earned an 82%, Cpl. Lyons 82%, and Roach 84% for the highest score. (Stone Dep. 33-34, Ex. 5, Ex. 23 p. 000018-20). However, the overall score sheet was incorrect because it relied in a miscalculation in the scoring. (Stone Dep. 33-35, Ex. 5, 11, 22, 23). On August 2, 2018, the candidates took the oral boards with the white male Lieutenant panel. (Roach Dep. 52, 171, 220, 222, Ex. 21 p.0048; Fuson Dep. Ex. 14). MCSO's records reflect that Roach's overall score for all testing was 86.68%, Sgt. Welsh 84.67%, and Cpl. Lyons 84%, but this was incorrect due to the miscalculation on the written test, the actual overall scores should have been Roach- 86.68%, Lyons 83.4% and Welsh, with the lowest score at 83.38%. (Stone Dep. 33-35, Ex. 11).

MCSO scheduled Cpl. Roach's executive interview for August 10, 2018, at 10:30 am, after Cpl. Lyons, but before Sgt. Welsh's. (Roach Dep. 180-181, Ex. 10 p. 000309).

**Sheriff Fuson Refuses to Acknowledge Potential for His Bias or Consider Performance**

Before Cpl. Roach's interview, Sheriff Fuson received letters of recommendation from personnel at the courthouse, including judges, supervisors, and directors. (Fuson Dep. 29, Ex.2; Roach Dep. 203). One letter described Cpl. Roach as "one of the most competent and dependable sheriff's department employees…one of the best that has ever been assigned to this building" and reported she can be called on for "calmness, self-assurance and respect" in emergencies. (Fuson Dep. 29, Ex. 2 p. 0063). A letter signed by two judges stated Cpl. Roach was, "one of the most capable individuals that has served in this capacity. . . . She is competent and dependable,

courageous in the face of danger, while at the same time, maintains her composure and professionalism." (Fuson Dep. 29, Ex. 2 p. 0062). Additionally, they noted, "[s]he commands respect and is able to assert herself when necessary to do so. She has been an excellent trainer for the new officers." (Id.). One letter included information that Cpl. Roach had been filling in for Sgt. Snider. (Roach Dep. 204; Fuson Dep. 29, Ex. 2 p. 0063). No other candidate provided letters of recommendation. (Fuson Dep. 30). Sheriff Fuson did not consider the letters in the promotional process, though he admitted had they been negative, he would have. (Fuson Dep. 30, 32; Stone Dep. 20).

Cpl. Roach came into the interview pleasant, smiling, neat, clean, and jovial, albeit nervous. (Fuson Dep. 51). Before she could even sit down, Sheriff Fuson informed her this year they were going to do something different and not go by the scores. (Roach Dep. 184,216, Ex. 5 p. 000224, Ex. 21 p. 0049). Sheriff Fuson even showed her the scores of all three applicants and refused to provide her a copy. (Roach Dep. 189, Ex. 5 p. 0224, Ex. 21 p. 0049). Sheriff Fuson learned Cpl. Roach had been performing the sergeant's duties for the last five years in her interview, in addition to one of the letters with that information. (Fuson Dep. 70, 71, Ex. 9 p. 0040; Roach Dep. 184, Ex. 21 p. 0050, Ex. 7 p. 0098).

Sheriff Fuson found it "off" that a sergeant would put a corporal in charge while away but agreed the decision to place her in charge spoke to Sgt. Snider's belief her. (Fuson Dep. 71-72, 74). Sheriff Fuson did not believe she had the ability to supervise all functions of the sergeant's position and manage her floor, despite having no basis for that belief. (Fuson Dep. 72-73, 103). Sheriff Fuson never asked her if she was fulfilling all the sergeant duties, nor about the duties she performed while acting sergeant. (Fuson Dep. 103). However, he acknowledged that she worked the second floor which was the busiest floor, that she was a "very high-paced worker" and she is

a "good worker." (Fuson Dep. 74-75). Sheriff Fuson also acknowledged that the sergeant position was created was for the second floor, but he was leaving it up to Lt. McNamana as to who to place where after the promotion. (Fuson Dep. 75-76).

Sheriff Fuson asked Cpl. Roach about her ideas to improve the courthouse, she suggested: 1) get rid of the jail sheet, and if that was not possible, a reform to how the jail sheet is executed, 2) yearly evaluations of employees, 3) add mirrors for security, 4) have deputies rotate floors, 5) increase security on the crowded floors, 6) adult probation and juvenile cases not be held on the same floor, and 7) add a barrier and more "rovers" in the rotunda as it is a safety risk. (Fuson Dep. 85-88, 91-92, Ex. 9 p. 0040; Roach Dep. Ex. 5 p.226). After this promotional process, MCSO did add mirrors to the courthouse, and additional deputies have been hired for the court. (Fuson Dep. 87, Ex. 9 p.0040; Roach Dep. Ex. 5 p.226).

Sheriff Fuson also asked a "if not you, who" question soliciting both positive and negative comments, which Roach found to be a loaded question; but after prompting, Cpl. Roach confided that Welsh procrastinates and regularly is reprimanded by Sgt. Snider and Lt. McManama, and Cpl. Lyons lets others tell him what to do. (Roach Dep. 210, 217, Ex. 5 p. 229; Fuson Dep. 95, 97, 211, 212, Ex. 9 p.0040; Snider Dep. 20). Ultimately, she identified Welsh and provided positive support stating he is "laid back, knows the computer, and he can interact with people." (Fuson Dep. 98 Ex. 9 p.0040; Roach Dep. 211, Ex. 5 p. 000229). Sheriff Fuson determined Cpl. Roach's responses were "more negative" than the other candidates' answers, even though he specifically requested good and bad, positive/negative responses, he only held Roach's "negative" responses against her, not the while males' responses. (Fuson Dep. 96-99, 105).

Regarding, "if not you, who," Welsh said he was not sure if Cpl. Roach saw the big picture or thought outside the box, but admitted Roach would be better suited because she exhibited

good leadership qualities. (Fuson Dep. 104, Ex. 9 p. 000041). Further exhibiting his bias and double-standard, Sheriff Fuson characterized Welsh's comment as "negative" but not "bad" and just a general observation (Fuson Dep. 105, 107). Welsh also stated that he would need to learn about the whole operation because he had not covered Sgt. Snider's duties. (Fuson Dep. 100-102, Ex. 9 p. 00041; Snider Dep. 25). As for things to change to improve, Welsh only suggested 1) more presence on the floor when there are crowds, 2) limiting activities that take away from the mission, such as the jail sheet and deputies look for attorneys (although he offered no solutions to this issue), and 3) stopping fire drills. (Fuson Dep. 16, Ex. 9 p. 0041).

**Sheriff Fuson's basis for failing to promote Cpl. Roach**

On August 23, 2018, Sheriff Fuson, via a memo, promoted Welsh to sergeant. (Fuson Dep. Ex. 12). Sheriff Fuson claimed he did not promote Roach due to her negative comments about the other candidates and her failure to formulate answers. (Fuson Dep. 147, Ex. 19 p. 2). He also claimed he was "taken aback" by Roach's answer to his "if not you, who" question." (Fuson Dep. 95). Although Sheriff Fuson stated he too would report someone for procrastination, he considered her answers negative. (Fuson Dep. 97). Sheriff Fuson felt Roach's "tone" was an issue. (Fuson Dep. 96). Sheriff Fuson also stated Roach's suggestions said were "general' although overall good, and he found her approach was "unorthodox" because she "brainstormed" while suggesting ideas, and she asked the Sheriff's opinion on them, even though he acknowledged this is not a bad thing to ask. (Fuson Dep. 91, 93-94, 99, 148). Sheriff Fuson based his decision on his personal observations comparing body language and demeanor. (Fuson Dep. 94, 104).

**Due to Cpl. Roach's Gender and Race, Sheriff Fuson Once Again Promoted A White Male**

Sheriff Fuson sent Roach a letter of non-selection. (Fuson Dep. 118, 120, Ex. 13 p. 00646; Roach Dep. Ex. 21 p. 0050-51). According to Fuson, the decision was "fairly clear." (Fuson Dep.

119). Sheriff Fuson based his decision solely on his interviews and did not consider the supervisor's review, nor that Roach had the highest overall scores, and he did not speak to Sgt. Snider or Capt. Stone about his decision. (Fuson Dep. 118-119, 122 124; Stone Dep. 45). Despite telling Sgt. Snider he would speak to him when the candidates were narrowed down to three, he did not. (Snider Dep. 14, 15). Sgt. Snider knew Sgt. Welsh was a procrastinator, and that Lt. McManama got onto him for procrastinating several times. (Snider Dep. 20). Prior to this instance, there is only one other documented example during the relevant time frame, *i.e.*, prior to Roach's November 9, 2018 EEOC charge, where the lowest scoring candidate was selected for promotion, and in that instance there were only two candidates, where the highest non-selected candidate had a longevity score of 2, and the candidates' overall scores were only 1.25% points apart, both of these candidates were White. (MSJ Ex. 3, D. Resp. to 3d Set of Interrogatories and RFP, MCSO 0000121-1238 at 1228; *see* Fuson Ex. 18).

## II.    SUMMARY JUDGMENT STANDARD

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150-151 (2000). In determining whether the moving party has met its burden, the [t]he evidence of the nonmovant is to be believed and court must view the factual evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U. S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986))('[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'"); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). It is axiomatic that the Court cannot make a credibility determination on summary judgment. *Hostettler v. Coll. of*

*Wooster*, 895 F.3d 844, 852 (6th Cir. 2018). The court's function is not to determine the truth of the matters asserted, but whether there is a genuine issue for trial. *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000). Summary judgment should not be imposed to deny a party an opportunity to present a meritorious claim or defense on his/her "day in court." *Smith v. Hudson*, 600 F.2d 60, 63 (6th Cir. 1979). *Walker v. Davis*, 649 F.3d 502, 505 (6th Cir. 2011) ("At the summary judgment stage, the relevant facts are the plaintiff's version of the facts . . .."); *Moran v. Al Basit, LLC*, 788 F.3d 201, 205 (6th Cir. 2015) (a plaintiff's testimony, without any additional corroboration, can be sufficient to defeat a motion for summary judgment).

## III. ARGUMENT

### A. MCSO Discriminated Against Cpl. Roach in violation of Title VII and the THRA

Under Title VII and the THRA an employee can prove discrimination under two separate theories: disparate treatment and disparate impact.[5] *Phillips v. Cohen,* 400 F.3d 388, 397 (6th Cir. 2005). A disparate treatment claim involves intentional discrimination against an employee on the basis of race, sex, or other prohibited factors. *Dunlap v. TVA,* 519 F.3d 626, 630 (6th Cir. 2008). A disparate impact claim does not require a showing of intent to discriminate. *Id.* (citing *Griggs v. Duke Power Co.,* 401 U.S. 424, 432 (1971)). Because in "some cases, employers' facially neutral practices that, in fact, are discriminatory in operation." *Ricci v. De Stefano*, 557 U.S. 557, 578 (2009) (citing *Griggs*). In *Griggs*, the Court stated the: "touchstone" for disparate-impact liability is the lack of "business necessity," in particular "[i]f an employment practice which operates to exclude [minorities] cannot be shown to be related to job performance, the practice is prohibited" and that it is the employer's burden to demonstrate that practice has "a manifest relationship to the

---

[5] Title VII and THRA claims are analyzed the same. *Chattman v. Toho Tenax Amer.,* Inc., 686 F.3d 339, 346 (6th Cir. 2012) (analyzing THRA claims under the Title VII standard); *Mullins v. Goodyear Tire & Rubber Co.*, 291 Fed. Appx. 744, 745 n.1 (6th Cir. 2008) ("The THRA is a state law analogous to Title VII and the statutes are analyzed identically.")

employment in question." *Id.* at 431-432. Moreover, the Supreme Court has recognized that "[e]mployment tests can be an important part of a neutral selection system that safeguards against the very racial animosities Title VII was intended to prevent." *Ricci v. De Stefano*, 557 U.S. at 584. Likewise, subjective or discretionary decisionmaking may constitute an employment practice that may be subject to a disparate impact analysis under Title VII. *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 991 (1988). Defendant only contends that Roach is unable to demonstrate pretext based on a disparate treatment theory, but it failed to argue that as a matter of law its subjective decision-making did not result in a disparate impact on minorities. (ECF 17, MSJ Memo. p. 10).

1. **A Reasonable Jury Could Conclude that MCSO Intentionally Discriminated Against Cpl. Roach, *i.e*, Disparate Treatment**

"[T]o survive summary judgment a plaintiff need only produce enough evidence to support a prima facie case and to rebut, but not to disprove, the defendant's proffered rationale." *Griffin v. Finkbeiner*, 689 F.3d 584, 592 (6th Cir. 2012). Here, Defendant challenges only Plaintiff's ability to demonstrate pretext. (ECF 17, MSJ Memo. p. 10). In failure-to-promote cases, the Sixth Circuit only requires a plaintiff to show that she possesses "similar qualifications" to the employee who received the promotion. *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 814 (6th Cir. 2011). In doing so, a comparison of characteristics such as "[d]ifferences in job title, responsibilities, experience, and work record," must be made in order to make an informed determination about whether an employment decision was based on pretext. *Leadbetter v. Gilley*, 385 F.3d 683, 691 (6th Cir. 2004). Moreover, the Supreme Court has cautioned that pretext need not "virtually jump off the page and slap you in the face" and indeed such rigor is not necessary and is "unhelpful and imprecise". *Ash v. Tyson Foods, Inc.,* 546 U.S. 454, 456-458 (2006). The following demonstrates evidence of pretext:

- Roach's overall score was higher in the objective testing phase. (Stone Dep. 33-35, Ex.

11).

- Welsh's overall score was the lowest on the objective testing phase. (Stone Dep. 33-35, Ex. 11).

- Roach had been employed longer than Welsh. (Fuson Dep. Ex. 11).

- Roach's lowest score in the testing phase was only when she was judged by the all-White, all-male panel of Lieutenants. (Roach Dep. 52, 171, 220, 222, Ex. 21 p.0048; Fuson Ex. 7, 11).

- Roach had experience filling for the Sergeant, Welsh did not. (Snider Dep. 12; Roach Dep. 92, 316; Fuson Dep. 72).

- Welsh stated if he did not get the job, Roach would be best suited for the position due to her leadership qualities. (Fuson Dep. 104, Ex. 9 p. 000041).

- Roach had numerous letters of recommendation from judges and directors who were familiar with her job performance at the court complex, other candidates did not. (Fuson Dep. 29, Ex.2; Roach Dep. 203).

- Roach took the initiative to ask Sgt. Snider to train her in multiple job duties the courthouse. (Snider Dep. 11, 13; Roach Dep. 94).

- Roach was regarded as an honest, fast-paced, hard-worker, who was reliable. (Fuson Dep. 31, 55, 74, 76; Snider Dep. 10-13).

- There were no black, female sergeants at MCSO, until *after* Roach filed her EEOC charge. (Fuson Ex. 15, Ex. 16 p. 00910).

- The upper-ranked chain of command- Lieutenants and higher are all white males, there are no females or black employees. (Fuson Dep. 46, Ex. 21).

- This is the only instance where the lowest scoring equivalent candidate was selected for

promotion during the relevant time frame. (MSJ Ex. 3, D. Resp. to 3d Set of Interrogatories and RFP, MCSO 0001211-1238 at 1228; *see* Fuson Ex. 18).

- The Sheriff disregarded the observation and opinion of the person best suited to observe and evaluate performance of the candidates, Sgt. Snider. (Fuson Dep. 118-119, 122 124; Stone Dep. 45).

- When asked to identify "all corporals and sergeants" job information, MCSO identified a total of 28 individuals, of that there were only 2 Black employees (Roach being one) (7.14%) and a total of 5 females (Roach being one) (17.857%). (MSJ Ex. 2, D. Resp. to 2d Set of Interrogatories and RFP, #19, Ex. 1).

- Roach trained approximately 20 deputies at the discretion of Lt. McManama, including Sgt. Welsh. (Snider Dep. 27; Roach Dep. 37, 219, 313, Ex. 22).

- Fuson stated that Roach's "demeanor," "body language," "tone" and "his "personal observations" during the interviewed played a part is his decision. (Fuson Dep. 94, 96, 104). Each statement masks discriminatory derision.[6]

- Statistically:

  o From February 12, 2005 to November 9, 2018, 80 officers were promoted at the MCSO, of which 19 (23.75%) were female, and there were only 3 females who

---

[6] *See, e.g., Yazdian v. ConMed Endoscopic Techs., Inc*., 793 F.3d 634, 652 (6th Cir. 2015):
There is a difference, however, between a refusal to follow an order and an assertion that an employee was "rude" or "defiant." Indeed, there may be some instances when the allegedly insubordinate act may be a response to a sort of unspoken, subliminal discrimination in the workplace. For example, a woman who takes a strong position may be considered "pushy," whereas a man who does the same is "assertive." One manager may call a black man "aggressive" and a white man "passionate" for the same speech. These are just a few examples of how subjective these adjectival labels can be. And whether these adjectives are evidence of discrimination or are legitimate grounds for termination requires examining the words in context and the demeanor of the speakers—quintessential jury functions.

were people of color (3.75%).[7] (MSJ Ex. 3, Promotions List, 1211-1215).

- o MCSO's last EEOC report, from 2017, stated that it employed 209 employees in "Police Protection" of which 60 were female (28.70%) and 149 were male (71.29%); but there were only 5 Black females (2.39%), 11 Black males (5.26%); a total of 16 (male and female) were Black (7.655%); 124 were White males (59.33%); and 53 were White females (25.35%). (MSJ Ex. 4 MCSO 2017 EEO4 Reports pp. 51-53, 63-66).

- o The latest U.S. Census data for Montgomery County demonstrates that 57.4% of the labor force in Montgomery County is female (almost double that employed by MCSO, and that 21.3% of the population is Black (more than double that employed by MCSO). (MSJ Ex. 5 U.S. Census data 7/1/19).

Considering all of this evidence of pretext in the light most favorable to Roach, there is a genuine issue of fact that the Sheriff's subjective decision(s) regarding promotion are tainted by racial and sex based bias. *Wright v. Murray Guard, Inc.,* 455 F.3d 702, 721 (6th Cir. 2006) ("[i]nquiries regarding what actually motivated an employer's decision are very fact intensive," such issues "will generally be difficult to determine at the summary judgment stage" and thus will typically require sending the case to the jury."). Summary judgment must be denied.

### 2. A Reasonable Jury Could Conclude that MCSO's Promotional Practices Have a Disparate Impact on Minorities and Women

The MCSO's practice of completely ignoring its more objective testing and evaluation in favor of the Sheriff's sole determination based on his subjective interview with candidates is discriminatory in operation. The Sixth Circuit adheres to the following analysis:

> Disparate impact analysis requires the Plaintiff to identify—with specificity—the particular procedure having an adverse effect. *Dunlap v. TVA*, 519 F.3d 626, 629

---

[7] This is the time period before Plaintiff filed her EEOC charge on November 9, 2018.

(6th Cir. 2008). A three-part burden-shifting test is then used to examine a disparate impact claim: (1) the plaintiff must establish a *prima facie* case for discrimination; (2) the employer may then show that the challenged procedure is justified by "business necessity"; and (3) the plaintiff can rebut the employer's justification by showing that other tests or selection protocols would serve the employer's interest without creating the undesirable discriminatory effect. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S. Ct. 2362, 45 L. Ed. 2d 280 (1975).

*Johnson v. Metro Gov't of Nashville & Davidson County*, 502 Fed. Appx. 523, 539 (6th Cir. 2012).

Rather than dispensing with the testing all together, had MCSO simply made the Sheriff's interview an equal or weighted component, along with other, more objective testing methods, MCSO's interest in selecting the best qualified candidate would have been achieved without creating a discriminatory effect. *McCabe v. Champion International Corp.*, 1990 U.S. App. LEXIS 18542, at *20 (6th Cir. Oct. 18, 1990) (managers to whom termination decisions were delegated "operated without any objective guidelines" and "discretion to make subjective decisions" was a specific employment practice that could give rise to a disparate impact analysis). To be sure, an objective scoring component has been recognized and encouraged by the Supreme Court and the Sixth Circuit. In *Ricci v. De Stefano*, the Court found that because the "lawful and beneficial" testing was discarded, in favor of other measures that were less objective, Title VII was violated. 557 U.S. at 581, 584. Likewise, the Sixth Circuit made a similar determination that had there been evidence defendants disregarded valid test scores, a valid disparate impact claim may have been asserted. *Johnson v. Metro Gov't of Nashville & Davidson County*, 502 Fed. Appx. at 542. Accordingly, because the MCSO's promotional policy, which ultimately relies solely on one subjective interview, dispensing with all other more objective elements, it has a disparate impact on minorities. The statistics lend credence to this conclusion. Moreover, Defendant has failed to articulate a business necessity for relying on one person's judgment without any degree of objectivity. Indeed, there is no legitimate reason for one person to wield so much power,

particularly when the facts support that person suffered from subconscious bias. *See e.g. Jamison v. McClendon,* 2020 U.S. Dist. LEXIS 139327 *1-5, 64-65 (S.D. Miss. Aug. 4, 2020) (discussing the doctrine of qualified immunity, the impact on Black men and women who have been denied equal protection of the law, and in some instances their lives, at the lands of law enforcement and pointing out the simple point that engaging in "legalistic argle-bargle" often loses sight of the basic purpose of federal discrimination laws- "to hold state actors accountable for violating federally protected rights"); *United States v. Murray,* 2020 U.S. Dist. LEXIS 111040 *15 (S.D. Ohio June 24, 2020) (recognizing the pervasive implicit or subconscious bias in the country against African-American males in the context of police stops and how such bias affects the behavior of people who believe they are not biased (*citing* Jennifer L. Eberhardt, Biased: Uncovering the Hidden Prejudice That Shapes What We See, Think, and Do)). Thus, summary judgment must also be denied on this basis.

### B. MCSO's Practices Violate Title IX and MCSO's Legal Analysis is Wrong

Without any legal basis whatsoever, Defendant contends that Plaintiff's Title IX claim should be dismissed because she did not file and EEOC charge alleging a Title IX violation. (MSJ Memo p. 22). Aside from the obvious, that there is no "Title IX" box to be checked on an EEOC charge, the statute simply does not require it. The EEOC charge filing prerequisite is a requirement for a Title VII claim, not for a Title IX claim. 42 USC §2000e–5(e)(1), (f)(1) (Title VII); *Doe v. Mercy Catholic Med. Ctr.*, 850 F.3d 545, 559 (3d Cir. 2017) ("Title IX doesn't have administrative hurdles like Title VII. This means Title IX plaintiffs can 'file directly in court'").

Defendant also contends that Plaintiff's Title IX claims "do not relate to education or an educational institution." (MSJ Memo p. 23). It attempts to bolster its analysis by what Plaintiff knew about Defendant's educational opportunities, which is an incorrect, deflective and restrictive

analysis. (Id.). Under Title IX "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681(a). Title IX applies to all aspects of activities by recipients of federal funds- not just funds from the Department of Education. *See* Dep't of Justice, Civil Rights Division, Title IX Legal Manual p. 7-8, 19-20, 29, 38 (January 11, 2001) (MSJ Ex. 6). Moreover, in response to the Supreme Court's decision in *Grove City College v. Bell*, 465 U.S. 55, 571, 572 (1984), Congress passed the Civil Rights Restoration Amendments Act of 1987 "to restore the broad scope of coverage and to clarify the application of Title IX…" which clarified that the definition of "program or activity" covers all operations of an entity receiving federal funds. Pub. L. 100-259, S. 557, 100th Cong. (1988).

As amended by the CRRA, Title IX now says in § 1687 that "program or activity" means "*all* of the operations" of the following kinds of entities, "any part of which" is extended federal funding:

■ state or local government instrumentalities, 20 U.S.C. § 1687(1);
■ colleges, universities, postsecondary institutions, public systems of higher education, local educational agencies, vocational education systems, and "other" school systems, *id.* § 1687(2);
■ "entire" corporations, partnerships, "other" private organizations, and sole proprietorships *if* assistance is extended to them "as a whole" *or* they're "principally engaged in the business of providing education, health care, housing, social services, or parks and recreation," *id.* § 1687(3)(A);
■ "entire" plants or other "comparable, geographically separate" facilities in the case of "any other" corporation, partnership, private organization, or sole proprietorship not described in subsection (3)(A), *id.* § 1687(3)(B); and
■ "any other entity" established by "two or more" entities described in subsections (1) through (3), *id* § 1687(4).

"No part of Title IX says it reaches only entities 'principally engaged in the business of providing education' Quite the opposite. Section 1687 leaves space aplenty for a variety of entities irrespective of what they're 'principally' engaged in — for example, state and local government

instrumentalities, private entities extended assistance as a whole, other private entities' entire plants or separate facilities, and *any* entity established by two or more covered entities." *Doe v. Mercy Catholic Med. Ctr.*, 850 F.3d 545, 555 (3d Cir. 2017). A "program or activity" under § 1687 is an "education program or activity" under § 1681(a) if it has "***features*** such that one could reasonably consider its mission to be, at least in part, educational." Id. (citing *O'Connor v. Davis*, 126 F.3d 112, 117 (2d Cir. 1997)). *See Klinger v. Dep't of Corr.*, 107 F.3d 609, 613-16 & n.5 (8th Cir. 1997) (Title IX applies to state prison systems due to educational programs offered); *Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881 (1st Cir. 1988) (Title IX applies to university's medical center because of residency program).

The discrimination prohibited by Title IX includes programs or activities like those offered by the Montgomery County Sheriff's Office. 20 U.S.C. § 1687(1)(A) (a 'program' is defined as "a department, agency, special purpose district, or other instrumentality of a State or of a local government"). The Department of Justice recognized that programs as diverse as state park workshops receiving Department of Interior funds, to county park boater education programs receiving funding from the Coast Guard, to vocational training for inmates that receive funds from the Department of Justice are covered. Dep't of Justice, Civil Rights Division, Title IX Legal Manual p. 8. "Generally, it covers all aspects of the educational program, including admissions, treatment of participants, *and employment*." Id.

Sheriff Fuson admitted that MCSO receives federal funding through grants, performs "Title 7" training throughout the county, and education and training to its officers and the public, on occasion it sends officers to federal agency training academies, and it has federal contracts. (Fuson Dep. 142- 143). Thus, MCSO's employment practices likewise fall within the purview of Title IX. Here, like a hospital's residency program, MCSO has programs or activities satisfying

Title IX's broad reach. Accordingly, drawing all inferences in Plaintiff's favor, sufficient facts demonstrate that Defendant's Motions with respect to Plaintiff's Title IX claims must be denied.

WHEREFORE, Defendant has failed to meet its burden to demonstrate that no reasonable jury could find that Defendant discriminated against Plaintiff on the basis of her race and gender, its motion for summary judgment must be denied in its entirety.

Respectfully submitted,

*/s Heather Moore Collins*
Heather Moore Collins BPR# 026099
Anne Hunter BPR# 022407
Ashley S. Walter BPR #037651
Collins & Hunter PLLC
7000 Executive Center Drive, Suite 320
Brentwood, TN 37027
615-724-1996
615-691-7019 FAX
heather@collinshunter.com
anne@collinshunter.com
ashley@collinshunter.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY certify that a copy of the foregoing has been e-mailed this 23rd day of October 2020 through the court's CM/ECF system to counsel of record:

W. Timothy Harvey
Rebecca Garman
310 Franklin Street
Clarksville, TN 37040
timharvey@wtharveylaw.com
*Attorney for Defendant Montgomery County Government*

*s/ Heather Moore Collins*
Heather Moore Collins
