## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **LISA ROACH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:19-cv-00698** |
| | ) | **Judge Aleta A. Trauger** |
| **MONTGOMERY COUNTY** | ) | |
| **GOVERNMENT,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM</u>

Plaintiff Lisa Roach brings suit against defendant Montgomery County, Tennessee (incorrectly named in the Complaint as the "Montgomery County Government"), asserting claims of race and sex discrimination in violation of Title VII of Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-101 *et seq.*, and sex discrimination in violation of Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681(a). (Doc. No. 1.) Now before the court is the defendant's Motion for Summary Judgment. (Doc. No. 16.) For the reasons set forth herein, the motion will be granted in part and denied in part.

## I.    FACTUAL AND PROCEDURAL BACKGROUND[1]

Roach, a Black woman, has been an employee of the Montgomery County Sheriff's Office ("MCSO" or "Sheriff's Office"), a division of Montgomery County, Tennessee, since 1999. (Doc.

---

[1] The facts set forth herein are drawn from the parties' exhibits, including the complete deposition transcripts filed by the plaintiff, and are undisputed unless otherwise indicated.

No. 1 ¶ 7.) John Fuson is the Sheriff of Montgomery County and has held that position at all times relevant to this lawsuit.

Roach began working in the Montgomery County Courthouse in 2002 as a court security officer. (Doc. No. 22-2, Roach Dep. 18.) In 2004, she began working as a General Sessions Bailiff in the Courts Complex division. At that time, she was trained as a bailiff by, and began working with, Phillip Snider. (Roach Dep. 25, 36, 38.) Snider became a sergeant around 2013 and was Roach's supervisor from that time until his retirement in June 2020. (Doc. No. 19-2; Doc. No. 22-4, Snider Dep. 7, 11.)

Sometime prior to 2015, Roach applied for an open position as corporal within the Courts Complex division. (Roach Dep. 31.) She was not selected for the position at the time; instead, it went to Jill Flores, a White woman. (Roach Dep. 31–32.) In the summer of 2015, Roach again applied for the position of corporal and, this time, was promoted to the position. (Roach Dep. 57–58.) Fuson was Sheriff at the time and made the ultimate decision to award the promotion. (Doc. No. 19-5.)

In July 2018, the Sheriff's Office posted a Memo advising employees of an open sergeant position in the Courts Complex/Courts and Process division and encouraging qualified employees to apply. (Doc. No. 19-6.) Any interested employee could apply by signing a list posted with the Memo. (*Id.*) Three people signed the list: Chris Lyons, Terrence (Terry) Welsh, and Roach. (Doc. No. 19-7.) All three applicants were corporals within the Courts Complex division at the time, working under the supervision of Sergeant Snider. (*See* Doc. No. 19-12 (Supervisor Reviews of Candidate Performance).) Lyons and Welsh had been promoted to corporal in 2014. (Doc. Nos. 19-8, 19-9.)

The Montgomery County Sheriff's Office Policies, Procedures, and Guidelines Manual ("Guidelines Manual") outlines the applicable promotion selection process and states as follows:

Employees eligible for [promotion] shall be selected in the following manner:

1. Written Test – 50 test questions from the *Policies, Procedures and Guidelines Manual*. 30 points total.

2. Oral Board – Ten questions to evaluate leadership and communication skills, and the application of the *Policies, Procedure and Guidelines Manual*. 30 points total.

3. Seniority – One-half a point for every year of service for a maximum of 20 years; ten points total.

4. File Review – Review of disciplinary actions for the previous 18 months. Ten points initially assigned. One point shall be subtracted for reprimand. Two points shall be subtracted per suspension, with one point for each day beyond the first day.

5. Supervisory Review – The employee's current supervisor shall evaluate the employee's behavior and performance, *e.g.* – attitude, demeanor, cooperation, interaction, punctuality, work quality, communication, etc. 20 points total.

6. The Sheriff or designee shall interview the top scoring candidates to fill a vacant position. The number of personnel to be interviewed shall be two times the number of vacancies, plus one.

7. Scores shall be retained for six months. Scores for written test, seniority, and file review shall be updated as an opening occurs.

(Doc. No. 19-13, at 13, Guidelines Manual § E-8.7.2.)

Notwithstanding the relatively objective procedure for selecting candidates to be interviewed, the Manual further provides that "[t]he Sheriff has the sole authority to make appointments to command-level positions, or to depart from this promotion policy in unusual circumstances where immediate action is required." (*Id.* at 14, Guidelines Manual § E-8.7.4.) The MCSO interprets this policy to mean that, once candidates are selected for an interview with the sheriff, the scores obtained from the initial portion of the application process are no longer relevant

to the decision and are not considered by the sheriff in making the decision of which candidate to promote. (Doc. No. 22-1, Fuson Dep. 19–21, 118–20.)

Roach, Welsh, and Lyons all took the written test for promotion in July 2018. There is no dispute that the plaintiff scored the highest of the three on this test. (Doc. Nos. 19-14, 19-15.) In July 2018, Snider completed a questionnaire regarding each applicant's performance. The highest score for the supervisor's review was 20. Snider gave Roach a score of 19, while he gave Welsh and Lyons scores of 17 and 16, respectively. (Doc. No. 19-12.) The oral board for the Courts Complex sergeant position was conducted on August 2, 2018, with five White, male lieutenants serving as board members. (Roach Dep. 166; Doc. No. 22-3, Stone Dep. 23.) The plaintiff's score on the oral board was 22.98; Welsh's was 24.78, and Lyons' was 22.8. (Doc. No. 19-19.) The plaintiff, having been employed by the MCSO since 1999, received a "longevity" (or seniority) score of 9.5. Welsh's score was 7, while Lyons' score was 10. (Doc. No. 19-16.) Each applicant received a score of 10 for "file review," meaning they had no disciplinary action on their records. (*Id.*) Adding all of these totals together, the plaintiff had an overall score of 86.68 out of 100. (*Id.*) Welsh had an overall score of 83.38, and Lyons had a score of 83.4. (Doc. No. 22-3, Stone Dep. 33–35.)

Based on the policy set forth in the Guidelines Manual, the sheriff was required to interview three candidates for the sergeant position. As there were only three applicants, Sheriff Fuson interviewed all three. He conducted these interviews on August 10, 2018. (Fuson Dep. 113–14; Doc. No. 19-20.) Following these interviews, Fuson selected Welsh for the position. (Doc. No. 19-21.) According to Fuson, his decision of whom to promote was based entirely on his interviews of the three candidates. (Fuson Dep. 123–26; Doc. No. 19-22, Fuson Aff. ¶ 3.)

Fuson's practice is that he does not ask each candidate the same questions; his goal is to "evaluate their thought process." (Fuson Dep. 21–22.) He goes into each interview with "some general questions" that he asks each candidate but then just lets the conversation proceed. (Fuson Dep. 22–23.) He testified that his decision in this case was based on the candidates' answers to his questions, statements, tone, demeanor, and body language. (Fuson Aff. ¶ 3; Fuson Dep. 95, 96.) He states in an Affidavit prepared in support of the defendant's motion:

> The purpose of my interview is to gauge the candidate's critical thinking, leadership style, and overall decision making. I did not base my decision on the race or gender of any of the candidates for promotion. I recall the Plaintiff offered some more negative critiques about the other candidates when I asked who she would promote if not her. While my question does invite constructive criticism as well as positive remarks, I felt the Plaintiff's responses were more negative and demeaning to others than the comments from the other candidates, particularly Terry Welsh who received the Sergeant position, and that she was focused on the negative aspects of the other candidates rather than offering a positive approach and a plan for how they could all work together cohesively. Additionally, Terry Welsh's responses to questions appeared to me to be based upon forethought in the organization of his response while Plaintiff Lisa Roach appeared to be brainstorming and rambling at times. Based upon their interview responses and demeanor, I felt Terry Welsh was a better candidate for the Sergeant position based upon his perceived leadership style.

(*Id.*)

Fuson does not believe that "a test alone" should determine who is promoted to a supervisory role within the MCSO. (*Id.* ¶ 5.) He states that, for that reason, the promotion policy changed after he became sheriff and after Snider became sergeant. (*Id.* ¶ 6.) He identifies several instances in which the person with the highest overall scores was not promoted. (*Id.* ¶ 7.) He testified that the objective scores matter, insofar as they determine which candidates will be selected for an interview (assuming there are more candidates than there are interview slots). (Fuson Dep. 20.)

The plaintiff's lawsuit is premised upon her claim that the selection of Welsh over her was discriminatory. She points out that she had been employed by the County longer than Welsh, even

though Welsh had been corporal longer. (*See* Doc. No. 19-9.) As corporal, Roach trained approximately twenty deputies, including Sgt. Welsh. (Snider Dep. 27; Roach Dep. 37.) Shortly after becoming corporal, Roach took the initiative to ask Sgt. Snider to train her to "do everything that [he] d[id]." (Snider Dep. 11.) Snider did so, sitting down with her "many a time" to go over his job duties; he eventually taught her every aspect of his job. (Snider Dep. 12; *see also* Roach Dep. 94.) Whenever Snider was off work, he asked Roach to fill in for him, and she would cover his job while also doing her own. (Snider Dep. 12–13.) Between October 2015 and November 2018, Roach filled in for Snider, acting as sergeant, over one hundred days. (*See* Roach Dep. 125 and Ex. 1, Doc. No. 22-9, at 1–2.) None of the other candidates expressed interest in learning his job, and Snider would not have trusted any of the others to fill in for him anyway. (Snider Dep. 13.) He also described Roach as "[p]robably the most honest and trustworthy person [he has] ever met" as well as the "[h]ardest working person [he has] ever worked with." (Snider Dep. 10–11.) Snider recommended Roach orally to Sheriff Fuson (Fuson Dep. 54), and he recommended Roach more strongly than the other two candidates for the position in his Supervisor Reviews. (Doc. No. 19-12.) In addition, Roach submitted to the sheriff several letters from judges and directors at the court who were familiar with her job performance at the Court Complex and who recommended her for the promotion to sergeant; the other candidates did not submit such letters. (Fuson Dep. 29–30; Roach Dep. 201–02; Doc. Nos. 22-9, at 18–19). Fuson did not take these letters of recommendation into consideration either. (Fuson Dep. 30–31.)

The plaintiff asserts that past promotions were based entirely on the candidates' scores. Snider, for example, testified that, when he was promoted to sergeant, when he went to his interview with the sheriff, Fuson told him, "you don't even need my interview because you already have it on points." (Snider Dep. 9.) That is, he had more points than anyone going into the

interview, and, in his experience at least, the "points part of the promotional policy was an important part of that whole process." (*Id.*) In addition, Roach testified that she had understood that promotions had always been based primarily on the points received during the initial phase of the process, but, when she arrived for her interview, Fuson told her, "we're going to do something different this time." (Roach Dep. 190.) She understood him to mean that, in her case, he was not going to promote her based on her scores. (Roach Dep. 190–92.) Regarding the defendant's claim that, when the plaintiff received her promotion to corporal in 2015, she did not score the highest on the initial phase of the promotional process (*see* Doc. No. 19-25), the plaintiff points out that she received the second highest total score, after Don Newlove, and that both she and Newlove were promoted to corporal the same day. (Doc. No. 19-24.)

There were no female sergeants at the courthouse at the time Roach applied for the position. (Fuson Dep. 127.) One Black woman sergeant was appointed in 2019, after the plaintiff filed her EEOC charge related to this case. (Fuson Dep. 133–34; Doc. No. 19-27 (EEOC Charge).) The upper-ranked chain of command at MCSO—lieutenants and higher—are all White males. (*Id.*) According to the plaintiff, between February 2005 and November 2018, 80 officers were promoted at MCSO, of whom 19 (23.75%) were female, and only 3 were women of color (3.75%). (Doc. No. 22-13, at 4–6.) MSCO's last EEOC report, from 2017, states that it employed 209 employees in "Police Protection," of whom 60 were female (28.70%) and 149 were male (71.29%); five were Black females (2.39%) and 11 were Black males (5.26%). (Doc. No. 22-14.) The latest available U.S. Census data for Montgomery County estimates that, as of July 1, 2019, 57.4% of the labor force in Montgomery County was female, and 21.3% of the population was Black. (Doc. No. 22-15.)

MCSO receives federal funding through grants, performs "Title 7" training throughout the country, and provides education and training to its officers and the public. (Fuson Dep. 142–43.)

The defendant now seeks judgment in its favor as to all claims asserted against it. Along with its Motion for Summary Judgment, the defendant filed a Memorandum of Law, Statement of Undisputed Material Facts,[2] and Notice of Filing, to which are appended various excerpts of deposition transcripts and exhibits. (Doc. Nos. 16–19.) The plaintiff filed a Response memorandum, Response to the Statement of Undisputed Material Facts, an Additional Statement of Facts, and her own Notice of Filing, with complete deposition transcripts and additional exhibits. (Doc. Nos. 20–22.) The defendant has filed a Reply and a Response to the Additional Statement of Facts. (Doc. Nos. 23–24.)

## II. STANDARD OF REVIEW

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.*

---

[2] Local Rule 56.01(b) requires a separate statement of *all* of the facts that the moving party contends are both material and undisputed. The purpose of the Rule is to "assist the Court in ascertaining whether there are any material facts in dispute." *Id.* The defendant failed to comply with this Rule, supplying a Statement of Undisputed Material Facts enumerating just seven "facts" (Doc. No. 18), even though the defendant's seven-page statement of "Facts" in the Memorandum in support of summary judgment incorporates a substantial number of additional facts, many of which are clearly material.

A fact is "material" within the meaning of Rule 56(c) "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Reeves v. Swift Trans. Co.*, 446 F.3d 637, 640 (6th Cir. 2006). A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Harris v. Klare*, 902 F.3d 630, 634–35 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record that it believes demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018); Fed. R. Civ. P. 56(c)(1)(A). The nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *Pittman*, 901 F.3d at 628.

The court views the facts and draws all reasonable inferences in favor of the nonmoving party. *Id.* Credibility judgments and weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018). As noted above, where there is a genuine dispute as to any material fact, summary judgment is not appropriate. *Id.* The court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question. *Id.* The mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient to survive summary judgment; rather, there must be evidence upon which the jury could reasonably find for the nonmoving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

## III.    DISCUSSION

### A.    Title IX

Count V of the Complaint asserts that (1) the defendant receives federal funding, as defined by Title IX, "for the operation of its services in providing training and education to the employees and citizens of Montgomery County"; (2) Title IX prohibits discrimination on the basis of sex

"under any education program or activity receiving Federal financial assistance," 20 U.S.C. § 1681(a); and (3) the plaintiff was subjected to discrimination on the basis of sex, in violation of Title IX. (Doc. No. 1 ¶¶ 52, 54, 55.) The defendant seeks dismissal of the Title IX claim on the basis that, first, the plaintiff did not include a Title IX claim in her EEOC Charge of Discrimination. Alternatively, the defendant argues that the plaintiff's claims do not relate to an "education program or activity."

As for the defendant's first argument, the plaintiff is correct that Title IX "has no administrative exhaustion requirement and no notice provisions. Under its implied private right of action, plaintiffs can file directly in court and can obtain the full range of remedies." *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 255 (2009) (citations omitted). The claim, therefore, is not barred by reason of its omission from the plaintiff's EEOC charge.

Nonetheless, the mere fact that Montgomery County receives federal funds and that it offers some educational and training programs to both citizens and employees does not mean that an employment discrimination claim against the County automatically falls within the scope of Title IX. The operative language of the statute provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any *education program or activity* receiving Federal financial assistance." 20 U.S.C. § 1681(a) (emphasis added). As the Department of Justice has explained:

> Title IX . . . applies to any *education or training program operated by a recipient of federal financial assistance*. For example, Title IX could cover such diverse activities as a forestry workshop run by a state park receiving funds from the Department of the Interior; a boater education program sponsored by a county parks and recreation department receiving funding from the Coast Guard; a local course concerning how to start a small business, sponsored by the state department of labor that receives funding from the Small Business Administration; state and local courses funded by the Federal Emergency Management Agency in planning how to deal with disasters; and vocational training for inmates in prisons receiving assistance from the Department of Justice . . . . Generally, it covers *all aspects of*

> *the education program*, including admissions, treatment of participants, and employment.

Dep't of Justice, Civil Rights Division, Title IX Legal Manual at 7–8 (January 11, 2001) (in the court's record at Doc. No. 22-16 and available online at https://feminist.org/wp-content/uploads/2020/06/ixlegalmanualDOJ.pdf) (emphasis added).

That is, Title IX simply does not apply to claims that do not involve discrimination related to education or training. *See id.* at 20 ("For example, if a State prison receives federal financial assistance, all the operations of the State Department of Corrections are covered by Title VI and Section 504, and *all the department's education and training programs are covered by Title IX*." (emphasis added)); *Doe v. Mercy Catholic Med. Ctr.*, 850 F.3d 545, 553–54 (3d Cir. 2017) (recognizing that, with the passage of the Civil Rights Restoration Act of 1987, 20 U.S.C. § 1687(1), Congress broadened the definition of "program or activity" but nonetheless "retained in § 1681(a) the modifier 'education' before 'program or activity'"); *see also Klinger v. Dep't of Corr.*, 107 F.3d 609, 614–156 (8th Cir. 1997) (affirming that the "Nebraska prison system as a whole . . . qualif[ies] as a 'program or activity' within the statutory definition" in 20 U.S.C. § 1687(1)(A) and that the Department of Correction received federal funds, and, therefore, was covered by Title IX, but also noting that "Title IX is only concerned with conditions of gender discrimination and inequality within . . . educational programs or activities").

In this case, the plaintiff does not allege discrimination in the operation of any education program or activity by Montgomery County. She testified that she was never denied any educational opportunities while employed by the MCSO. (*See generally* Roach Dep. 297–301.) Consequently, Title IX is not implicated, and the defendant is entitled to summary judgment in its favor on the plaintiff's Title IX claim.

### B.    Title VII and the THRA

#### 1.    *Disparate Impact*

The plaintiff alleges sex and race discrimination in violation of Title VII and the THRA. Because "[t]he analysis of claims brought pursuant to the THRA is identical to the analysis used for Title VII claims," *Bailey v. USF Holland, Inc.*, 526 F.3d 880, 885 n.1 (6th Cir. 2008), the court addresses these claims together.

Both statutes make it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 346 (6th Cir. 2012) (citing 42 U.S.C. § 2000e–2(a)(1)); *see also* Tenn. Code Ann. § 4-21-401(a)(1). A plaintiff seeking to prove discrimination in violation of Title VII may proceed under two distinct theories: disparate treatment and disparate impact. The defendant's Memorandum addresses only the former; the plaintiff asserts in her Opposition to the defendant's Motion for Summary Judgment that she intends to pursue a claim based on the latter theory as well. (Doc. No. 21, at 13–14, 17–19.)

A disparate impact theory of discrimination exists because "some employment practices, adopted without a deliberately discriminatory motive, may in operation be functionally equivalent to intentional discrimination." *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 987 (1988)). "The disparate impact theory requires a plaintiff to demonstrate that a facially neutral employment practice falls more harshly on one group than another and that the practice is not justified by business necessity." *Dunlap v. Tenn. Valley Auth.*, 519 F.3d 626, 629 (6th Cir. 2008) To proceed under this theory, a plaintiff must first "establish a *prima facie* case of discrimination—*i.e.*, the plaintiff must establish that an adverse impact has occurred." *Id.* If she succeeds at that step, "the employer must show that the protocol in question has 'a manifest relationship to the

employment'—the so-called 'business necessity' justification." *Id.* (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971)). "The plaintiff must then show that other tests or selection protocols would serve the employer's interest without creating the undesirable discriminatory effect." *Id.* (citing *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 432 (1975)).

To establish a *prima facie* case, the plaintiff must (1) identify a "specific employment practice to be challenged"; and (2) "prove[] that the challenged practice has an adverse impact on a protected group" through the use of "relevant statistical analysis." *Id.* In this case, the "specific employment practice" the plaintiff identifies and seeks to challenge is the MCSO's practice of "ignoring its more objective testing and evaluation in favor of the Sheriff's sole determination based on his subjective interview with candidates." (Doc. No. 21, at 17.) She argues that this practice has no legitimate business necessity, because the MCSO could have made the sheriff's interview an equal or weighted component of the decision-making process, "along with other, more objective testing methods," and thus achieved its "interest in selecting the best qualified candidate . . . without creating a discriminatory effect." (Doc. No. 21, at 18.) She then concludes, without reference to any evidence whatsoever, that, "because the MCSO's promotional policy . . . ultimately relies solely on one subjective interview, dispensing with all other more objective elements, it has a disparate impact on minorities." (*Id.*) She then claims that "[t]he statistics lend credence to this conclusion" and that the defendant has failed to articulate a "business necessity for relying on one person's judgment without any degree of objectivity . . . , particularly when the facts support that person suffered from subconscious bias." (Doc. No. 21, at 18–19.)

The statistics offered by the plaintiff, however, do not support a *prima facie* case of discrimination under the disparate impact theory. She points to statistics regarding the racial and gender makeup of Montgomery County and the racial and gender makeup of the MCSO, which

indicate that the employees of the MCSO are not as diverse as the population of the county as a whole. She also offers some statistics regarding the numbers of women and people of color who were promoted within the MCSO from February 2005 through November 2018. Notably lacking, however, is any meaningful analysis of those statistics. Without such analysis—likely by an expert qualified to interpret the statistics—it is not possible to discern from the bare numbers that fewer women and people of color were promoted within the MCSO than one would expect based on the number of women and members of a racial minority employed by the MCSO as a whole.[3] Further, and more critically, the plaintiff offers no evidence regarding the number of qualified women, Black women, or Black people generally who have sought and been denied employment at MCSO or who have sought and been denied promotions. As a result, her raw data say nothing about whether the MCSO's hiring or promotional policies have a disparate impact on minority applicants for employment or candidates for promotion. *See Hawkins v. Memphis Light, Gas & Water*, 520 F. App'x 316, 322 (6th Cir. 2013) ("[Plaintiff] did not provide any statistics or statistical analysis regarding the number of qualified African-Americans who allegedly applied for positions. Without evidence of the racial composition of the pool of qualified candidates, a reasonable factfinder would be unable to determine whether bias motivated [Defendant's] decisions, or if the decisions were based on legitimate selection criteria or chance.").

Because the plaintiff has not produced "relevant statistical analysis" showing that "the challenged practice has an adverse impact on a protected group," she has not established a *prima*

---

[3] The plaintiff states that the MCSO's last EEOC report, from 2017, shows that 28.70% of employees were women, 7.66% were Black, and 2.39% were Black women. (Doc. No. 21, at 17 (citing Doc. No. 22-14).) 23.75% of the people promoted from 2015 through 2018 were women, slightly less than the total percentage of women employees, but 3.75% of the people promoted were Black women, slightly more than the total percentage of Black, female employees. The court is no statistician, but these numbers do not glaringly establish that the MCSO's promotional policies have a disparate impact on Black women.

*facie* case of discrimination under a disparate impact theory. The defendant is entitled to summary judgment on the plaintiff's disparate impact claim.

### 2. *Disparate Treatment – Legal Standards*

Title VII disparate treatment claims can be proven by direct or circumstantial evidence. *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004). When, as here, a plaintiff relies on circumstantial evidence to prove her case, the court analyzes the claim under the familiar three-step *McDonnell Douglas* framework. *See Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 703 (6th Cir. 2007) (referencing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). The first stage of the *McDonnell Douglas* analysis requires the plaintiff to establish a *prima facie* case of discrimination. To do so, a plaintiff seeking to prove discrimination under a disparate-treatment theory, based on a failure to promote, must demonstrate that:

> (1) she is a member of a protected class; (2) she applied for and was qualified for a promotion; (3) she was considered for and was denied the promotion; and (4) an individual of similar qualifications who was not a member of the protected class received the job at the time plaintiff's request for the promotion was denied.

*White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 240 (6th Cir. 2005) (citing *Nguyen v. City of Cleveland*, 229 F.3d 559, 562–63 (6th Cir. 2000)). If the plaintiff demonstrates a *prima facie* case of discrimination, the burden shifts to the employer to offer a legitimate, nondiscriminatory explanation for its actions. *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009).[4] If the

---

[4] In *Chen*, the Sixth Circuit acknowledged then-recent criticism of its three-part test and emphasized that the test should not be applied formalistically, "lest one lose the forest for the trees." *Chen*, 580 F.3d at 400 n.4. Courts should engage in a commonsense inquiry: "did the employer [take the adverse action] for the stated reason or not? . . . One can distill the inquiry into a number of component parts, . . . [b]ut that should not cause one to lose sight of the fact that at bottom the question is always whether the employer made up its stated reason to conceal intentional discrimination." *Id.*

defendant does so, the burden shifts back to the plaintiff to show that the defendant's proffered reason is pretextual. *Clay*, 501 F.3d at 704.

In this case, there is no dispute, for purposes of the defendant's Motion for Summary Judgment, that the plaintiff can establish a *prima facie* case based on the MCSO's failure to promote her to sergeant. The defendant argues, however, that it has proffered legitimate, non-discriminatory reasons for Sheriff Fuson's decision to promote Terry Welsh instead of the plaintiff and that the plaintiff cannot show that these reasons are a pretext for discrimination.

### 3.	The Defendant's Proffered Reasons for Its Action

The defendant's proffered reason, in short, is that Fuson interviewed all three candidates and decided, based solely on his interviews, that, while all three candidates were qualified, Terry Welsh was the best fit for the position. The sheriff made this assessment based on the candidates' responses to his questions, their statements, demeanor, body language, and tone. He believed that the plaintiff offered more negative assessments of her counterparts when asked to identify who should be promoted, if not herself. To him, it seemed that her difficulty in answering that question appeared to be due, at least in part, to her absolute conviction that she was entitled to the promotion. (Fuson Dep. 95–96.) Fuson perceived that, when Roach was asked to offer suggestions as to what could be changed or improved, the plaintiff appeared to be brainstorming, looking at the ceiling, and talking more to herself than to him when responding. (Fuson Dep. 148.) He also claimed that her responses were ideas that had been floating around the courthouse for a while and at times were already in the works. (Fuson Dep. 148–49.) While Welsh offered similar responses, Fuson perceived him to have more "forethought" and that the way he processed and presented his answers showed a better leadership style. (Fuson Dep. 149; Fuson Aff. ¶ 3.) Fuson expressly denies that race or gender played a role in his decision. (Fuson Aff. ¶ 3.)

The plaintiff does not contest that the defendant has satisfied its burden of offering a non-discriminatory reason for promoting Welsh instead of her.

### 4. Pretext

The Sixth Circuit has identified "three interrelated ways" of showing pretext: "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's decision." *Hostettler v. Coll. of Wooster,* 895 F.3d 844, 858 (6th Cir. 2018) (quoting *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 431 (6th Cir. 2014)). "The three-part test for pretext 'need not be applied rigidly,' but rather 'is a commonsense inquiry.'" *Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 811 n.10 (6th Cir. 2020) (quoting *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 282 (6th Cir. 2012)). Thus, to successfully oppose summary judgment, the plaintiff must produce sufficient evidence from which a jury could reasonably reject the City's reason for the failure to promote. *Chen*, 580 F.3d at 400. As the Sixth Circuit has explained:

> The plaintiff must produce sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that the defendant[] . . . did not honestly believe in the proffered nondiscriminatory reason for its adverse employment action. To show an honest belief, the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made."

*Mickey*, 516 F.3d at 526 (internal quotation marks and citations omitted). In order "to survive summary judgment, a plaintiff need only produce enough evidence to support a *prima facie* case and to rebut, but not to disprove, the defendant's proffered rationale." *Griffin v. Finkbeiner*, 689 F.3d 584, 593 (6th Cir. 2012).

As evidence of pretext, the plaintiff points to the evidence in the record that indicates that she was not just qualified, but significantly *more* qualified for the promotion than Welsh, including her overall score on the objective testing phase, her extensive experience in filling in for Snider,

Snider's high opinion of her and his strong belief that she was the most qualified candidate, which he had communicated to Fuson prior to the interviews, and the letters of recommendation she brought with her to the interview with Fuson. The plaintiff also points out that the entirety of the upper-ranked chain of command at MCSO are all White males and that there were no Black, female sergeants until after the plaintiff filed her EEOC charge. She also claims that Welsh's selection was the "only instance" during the relevant time frame that the lowest-scoring candidate was selected for promotion. She points to the racial demographics of the MCSO, which does not reflect the racial diversity of the community at large. She argues that all of this evidence, viewed in the light most favorable to the plaintiff, gives rise to a genuine issue of fact as to whether the sheriff's subjective decision to promote Welsh instead of her was "tainted by racial and sex based bias." (Doc. No. 21, at 17.)

For its part, the defendant points to evidence showing that Fuson specifically, and the MCSO more generally, have promoted both women and African-American candidates to supervisory positions, including to the ranks of sergeant and corporal, and that the plaintiff is not the only candidate for a promotion who has gone into an interview with Fuson with the highest overall score but did not receive the promotion. Fuson has identified seven other individuals, not including Welsh, whom he promoted to sergeant despite not having the highest overall score among the candidates interviewed. (*See* Fuson Aff. ¶ 7.) The defendant also argues that the plaintiff's claim that she was arguably more qualified for the position is not, standing alone, sufficient to establish pretext.

In *Ash v. Tyson Foods, Inc.*, 546 U.S. 454 (2006), the Supreme Court held that "qualifications evidence may suffice, at least in some circumstances, to show pretext." *Id.* at 457. The Sixth Circuit, in the wake of *Ash*, has recognized that, "[i] f an applicant is significantly better

qualified than the competition, but not selected, it can be inferred that discrimination played a part in the decision." *Philbrick v. Holder*, 583 F. App'x 478, 485 (6th Cir. 2014). More specifically:

> Relative qualifications establish triable issues of fact as to pretext where the evidence shows that either (1) the plaintiff was a plainly superior candidate, such that no reasonable employer would have chosen the latter applicant over the former, or (2) plaintiff was as qualified as if not better qualified than the successful applicant, and the record contains other probative evidence of discrimination.

*Id.* (quoting *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 815 (6th Cir. 2011) (internal quotation marks and other citations omitted)).

In *Philbrick*, the defendant's legitimate, non-discriminatory reason for promoting a candidate other than the plaintiff was that the selected candidate had "better interview scores and was perceived to have a more well-rounded background." *Id.* While the defendant argued that the plaintiff had failed to establish pretext, for purposes of overcoming the defendant's motion for summary judgment, the court disagreed, finding that the plaintiff had presented evidence that she was the "plainly superior candidate" and, consequently, that her claim survived summary judgment. This was the case, even though the selected candidate had performed better on the interview, based on "inherently subjective" ratings. *Id.*

The court acknowledged that, under the "honest belief" rule, liability cannot be imposed upon an employer who "honestly, but mistakenly, believes in the proffered reason given for the hiring decision at issue." *Id.* at 487 (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998)). The court also noted, however, that, "to establish an honestly held belief, the employer must produce evidence that it made a 'reasonably informed and considered decision.'" *Id.* (quoting *Smith*, 155 F.3d at 807). Thus, the Sixth Circuit has repeatedly held, in situations where the "asserted business judgment is so 'ridden with error' that the employer could not have honestly relied on it, pretext may be shown." *Id.* (quoting *In re Lewis*, 845 F.2d 624, 633 (6th Cir. 1988) (other citations omitted). Based on these principles, the court found that the plaintiff had

"presented sufficient evidence from which a reasonable jury could find that [the supervisor] did not make a reasonably informed and considered decision that [the selected candidate] was the better qualified candidate, and that the proffered reason for selecting [him] is unworthy of belief." *Id.*

In this case, although it is a close call, the court finds that the plaintiff's evidence is sufficient to create a triable issue of fact as to whether the defendant's proffered reasons for promoting Welsh instead of the plaintiff are pretext. In particular, the evidence supports a conclusion that the plaintiff was not simply qualified for promotion but significantly *more* qualified than the other two candidates, based on her higher total scores on the more objective stage of the promotion process, the efforts she took to learn the requirements of the position from Snider, her having filled in for Snider on dozens of occasions over the course of three years, Snider's unqualified recommendation of her, and the letters of recommendation she submitted to Fuson. In addition, she has pointed to irregularities in the process—specifically, that it is at least unusual for the individual with the lowest scores going into the interview to be promoted. Further, Fuson willfully disregarded evidence that the plaintiff was plainly more qualified: he refused to consider the third-party recommendations the plaintiff attempted to bring to his attention;[5] he discounted Snider's recommendation to him, even though Snider was in the best position to know the relative qualifications of the three candidates, since all three were under his direct supervision; and he made his decision based entirely on his subjective perception, formed from relatively brief

---

[5] The plaintiff testified that he did not even look at the letters she brought to the interview, at least in her presence. (Roach Dep. 201.) The sheriff testified that he received the recommendations by mail as well, although he does not indicate when, and that he read them but did not consider them in making his decision. (Fuson Dep. 29–31.)

interviews, that Welsh would make a better leader, invoking such inherently subjective factors as the candidates' body language, demeanor and tone.

Under *Provenzano*, 663 F.3d at 815, evidence that the plaintiff was the "plainly superior candidate, such that no reasonable employer would have chosen the latter applicant over the former," standing alone, is sufficient to give rise to an inference of pretext. Here, the record arguably also includes "other probative evidence of discrimination." *Id.* As a result, a jury could conclude that the sheriff did not "make a reasonably informed and considered decision that [Welsh] was the better qualified candidate[] and that the proffered reason for selecting [Welsh] is unworthy of belief." *Id.*

The defendant is not entitled to summary judgment on the plaintiff's disparate treatment claim.

## IV.    CONCLUSION

For the reasons set forth herein, the court will grant in part and deny in part the defendant's Motion for Summary Judgment. An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge